**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

CHRISTUS ST. VINCENT
REGIONAL MEDICAL CENTER,

          Petitioner/Plaintiff,

   vs.                              No. _____

DISTRICT 1199NM, NATIONAL
UNION OF HOSPITAL AND
HEALTHCARE EMPLOYEES,
AFSCME, AFL-CIO,

          Defendant.

## CHRISTUS ST. VINCENT REGIONAL MEDICAL CENTER'S PETITION TO VACATE ARBITRATION AWARD

Petitioner CHRISTUS St. Vincent Regional Medical Center ("CSVRMC" or the "Employer"), pursuant 9 U.S.C. § 10 of Federal Arbitration Act ("FAA"), hereby gives notice to this Court and District 119NM, National Union of Hospital and Healthcare Employees, AFL-CIO, AFSCME (the "Union") of its Petition to Vacate the Arbitration Award ("Petition"), for the Court to vacate the Arbitration Award issued by Michael S. Hill on January 13, 2017, in *District 1199NM, National Union of Hospital and Healthcare Employees AFCME, AFL-CIO and CSVRMC*, FMCS Case No. 16-54653-7, a copy of which is attached as Exhibit A (the "Award"). For the reasons set forth herein, the Award regarding the termination grievance ("Grievance") for Sharon Argenbright ("Ms. Argenbright" or "Grievant"), under the 2014 Nurse collective bargaining agreement ("CBA") between CSVRMC and the Union should be vacated. The Union

has indicated that it opposes judicial challenge to the Award. In support of this Petition, CSVRMC states as follows:

## I.      THE PARTIES

1.      CSVRMC is a 501(c)(3) non-profit organization with its principal place of business at 455 St. Michaels Drive, Santa Fe, NM, 85405. CSVRMC is an employer within the meaning of Section 2(2) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 152(2).

2.      The Union is a labor organization with its principal office located at 1404 Taos Street, Santa Fe, NM 87504. The Union is a labor organization representing employees in industries affecting commerce within the meaning of Section 2(5) of the NLRA, 29 U.S.C. § 152(5).

## II.     JURSDICTION AND VENUE

1.      This Petition is filed pursuant to the Federal Arbitration Act. 9 U.S.C. § 12.

2.      As more fully developed below, the underlying dispute between CSVRMC and the Union involves an alleged violation of a collective bargaining agreement between the parties.

3.      A proceeding for violation of contract between an employer and a labor organization representing employees in an industry affected by commerce is within the jurisdiction of a federal district court under Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185.

4.      Venue lies within this judicial district pursuant to 28 U.S.C. § 1391(b).

## III.    STANDARD OF REVIEW

5.      Federal courts have the power to enforce or vacate labor arbitration awards under Section 301 of the LMRA, 29 U.S.C. § 185, based on the authority to compel labor arbitration. *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 596-99 (1960) ("*Enter. Wheel*"); *Textile Workers v. Am. Thread Co*., 291 F.2d 894, 896 (4th Cir. 1961). Courts petitioned to enforce or vacate labor arbitration awards are generally deferential to the arbitrators' analyses, interpretations of CBAs and law, and evidentiary and procedural rulings.

2

*Enter. Wheel,* 363 U.S. at 596; *see also Chevron Mining Inc. v. United Mine Workers of Am. Local 1307*, 648 F.3d 1151, 1154 (10th Cir. 2011).

6.      But an arbitrator's decision is not wholly beyond the reach of judicial review. The Supreme Court has stated that:

> [A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. ***When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award***.

*Enter. Wheel,* 363 U.S. at 597 (1960) (emphasis added).

7.      Courts have interpreted this Supreme Court jurisprudence to mean that an arbitrator who makes a decision in conflict with the express terms of the parties' collective bargaining agreement commits an ultra vires act that warrants vacatur. *See*, *e.g.*, *Delta Queen Steamboat Co. v. Dist. 2 Marine Eng'rs Beneficial Ass'n, AFL-CIO*, 889 F.2d 599, 602 (5th Cir. 1989). Therefore, "[f]ederal courts are free to scrutinize the award to ensure that the arbitrator acted in conformity with the jurisdictional prerequisites of the collective bargaining agreement. *Id.* (citing *Container Prods., Inc. v. United Steelworkers of Am.*, 873 F.2d 818, 820 (5th Cir.1989*)*. The Tenth Circuit acknowledges that federal courts may review arbitration awards to determine whether the arbitrator interpreted and applied the collective bargaining agreement in a manner rooted in the agreement or ultra vires outside of the arbitrator's authority. *Int'l Bhd. of Elec. Workers, Local Union Nos. 12, 111, 113, 969 v. Prof'l Hole Drilling, Inc.*, 574 F.2d 497, 503 (10th Cir. 1978); *see also LB & B Assocs., Inc. v. Int'l Bhd. of Elec. Workers, Local No. 113*, 461 F.3d 1195, 1197 (10th Cir. 2006) (stating that an arbitrator's discretion "is not unlimited").

## IV.    STATEMENT OF THE CASE

8.      The Court should vacate the award because it is in conflict with the express terms of the parties' collective bargaining agreement, and is contrary to well-established public policy.

3

9.     First, the Arbitrator's Award should be vacated because the Arbitrator found "clear and convincing evidence" that Ms. Argenbright violated her Final Warning – which instructed her not to access Surgical Services without a business purpose and without obtaining authorization.  Ms. Argenbright disregarded the Final Warning and accessed Surgical Services on at least two separate occasions in the same day, again without a business purpose and without authorization. This finding alone is grounds for upholding the termination pursuant to the progressive discipline policy set forth in the parties' CBA. In light of the Arbitrator's express finding on this issue, his reversal of the Employer's termination decision is ultra vires.

10.     Second, the Arbitrator's Award should be vacated because the Arbitrator found there was "reason for suspicion" that Ms. Argenbright improperly used protected patient information for her own personal gain.  The Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 29 U.S.C. Sections 1181 *et seq.;* 42 U.S.C. Sections 1320d *et seq.,* and the Employer's policies under the law prohibit employee use of protected patient information for unauthorized purposes. The Arbitrator acknowledged witness testimony establishing that Ms. Argenbright had documents containing protected patient information in her possession on a day that she was not working at the hospital. This suggests that she either removed those documents from the hospital without authorization or created her own documents without authorization. Under either scenario, Ms. Argenbright accessed, collected, and copied information from patient files in violation of the parties' CBA and the hospital's policies, for reasons unrelated to patient care. This finding is separate grounds for termination, pursuant to express language of the CBA and the hospital's policies.  Ms. Argenbright was well-aware of these rules and acknowledged receipt of them. In light of the Arbitrator's finding and the witnesses' acknowledged testimony, the Arbitrator's reversal of the Employer's termination decision is also ultra vires.

11.     The Arbitrator's Award violates public policy under HIPAAA. A major goal of the HIPAA Privacy Rule, codified at 45 CFR Parts 160 and 164, is to assure that individuals' health information is properly protected for the benefit of the public's health and well-being. The

4

Employer has instituted rules to ensure its compliance with the HIPAA Privacy Rule. The parties' CBA also contains rules to ensure HIPAA compliance. Reinstating an employee when there is "reason for suspicion" that she either removed patients' health information from hospital premises, or accessed, collected, and copied patient health information into her notes for her own personal use is directly contrary to public policy providing that individuals' health information should be properly protected.

      12.     As a result of the foregoing, CSVRMC asks the Court to set aside the Award.

## V.    FACTUAL AND PROCEDURAL BACKGROUND

### The Relevant CBA Provisions and Employer Policies and Procedures.

      13.     At hearing, the parties stipulated that this Grievance arises under the CBA. Award at 2; Exhibit B, excerpts from the parties' CBA. The CBA provides certain policies that bargaining unit employees such as Ms. Argenbright must follow, including:

**Article 6 – Union Activity, Visitation and Access**

      6.2.2.     Time off… shall not be granted if it will interfere with the efficient operation of CSVRMC or optimum patient care. Delegates shall notify their immediate supervisor when they leave and return to their job….

      6.2.3.     Delegates shall not solicit on behalf of the Union during working time or in work areas. This includes working time of the associate conducting the solicitation as well as the associate to whom such activity is directed.

      6.2.4.     Delegates shall not use CSVRMC's machines, equipment, supplies, mailbox services, or e-mail for the solicitation or dissemination of Union literature or correspondence at any time.

**Article 9 – Working Hours and Overtime**

      9.3.     Rest Period. … It should be understood that associates on break should not go into other work areas for non-business purposes and interfere with or distract other associates who are working at the time….

**Article 12 – Discipline and Discharge**

      12.5     The parties agree that associates will not access, collect, copy, misuse or disclose patient medical charts, potentially identifiable patient medical information, or personnel files.

**Article 34 – Safety Regulations**

34.2     The failure of an associate to observe CSVRMC's safety rules, state or federal laws pertaining to safety, or regulations☒promulgated by the state or federal government or any agency thereof may subject the associate to disciplinary action.☒

14.     The Employer also had policies in place regarding HIPAA, which all employees must follow. Award at 2-3; Exhibits C and D, copies of HR Policy 104 and the HIPAA Confidentiality & HIPAA Information Access Agreement, respectively.

15.     Ms. Argenbright received corrective actions due to her repeated violations of the CBA provisions and the Employer's policies and procedures regarding HIPAA, including a Final Warning and Termination. Award at 3-4; Exhibits E and F, copies of the respective corrective action forms.

16.     The Final Warning was not at issue in this arbitration; in fact, it was not challenged by the Union at all. Exhibit G, Transcript of Proceedings ("Tr."), 54:13-55:21. This case challenged whether the Employer had just cause to issue the Termination corrective action. As explained below, the Employer had just cause to terminate Ms. Argenbright and it followed the steps of progressive discipline as required by the parties' CBA. *See* Exhibit B, Article 12. [1]

**The Employer Issued a Final Warning Due to Ms. Argenbright's Unauthorized Access to a Secured Area, and the Union Did Not Grieve It.**

17.     Testimony at the Arbitration hearing established that Ms. Argenbright's Final Warning was the result of her conducting Union business in a secure area without authorization (the "2015 Surgical Services Incident"). *See* Award at 3; Exhibit E. On May 16, 2015, she used her badge to access the Post Anesthesia Care Unit ("PACU") area of Surgical Services, which is a high-risk area adjacent to the operating rooms. *Id.*; *see also* Exhibit G, Tr. 142:18-143:3; 145:13-24; 692:13-693:15.

---

[1] The Arbitrator failed to consider the parties' progressive discipline policy. In fact, throughout the 35-page Award, the Arbitrator failed to reference the parties' CBA, with the exception of a brief reference to the Employer's management rights over decisions concerning the counseling, reprimanding, discipline, and discharge of associates for just cause.

18.     Jan Weidner, the Interim Director of Surgical Services, credibly explained that unauthorized entry, personal business, non-employer-related business, and review of patient information are disallowed in the Surgical Services area without management approval. Award at 29-30; Exhibit G, Tr. 142:18-143:3; 145:13-24; 692:13-693:15; 698:8-19. The Employer controls who may be admitted to this area. Award at 29-30; Exhibit G, Tr. 693:16-694:3.  Entry is guarded by supervision, and the judgment as to whether an employee's work is work-related is judged by management. Award at 30; Exhibit G, Tr. 697:3-698:7. Even hospital employees need authorization to access this area if they do not have a business purpose. Award at 29-30; Exhibit G, Tr. 142:18-143:3.

19.     In the 2015 Surgical Services Incident, Ms. Argenbright entered Surgical Services without authorization, and without a business purpose. Award at 10, 27; *see also* Exhibit G, Tr. 145:13-24. She was not assigned to Surgical Services on the day in question. Award at 19; Exhibit G, 145:13-24; 622:7-8. Ms. Argenbright was acting as a Union Delegate - a shop steward - to perform Union business, not hospital business.  She used her badge to access the area to investigate a grievance involving another employee. Award at 27; Exhibit G, Tr. 205:6-9; 228:19-25; 622:7-8. She reviewed confidential log books and hospital records containing protected health information, such as patients' FIN numbers, names, ages, and treating physicians. Award at 19; Exhibit G, Tr. 205:16-25; 704:2-705:19; 712:13-713:1. Union Delegates are not allowed to review this kind of protected patient information without permission: patients need to be protected from the unauthorized use of their medical information. *Id.*

20.     Ms. Argenbright's conduct was especially unwarranted in view of the status of the Union and Employer's discussions regarding the grievance.  Information about the grievance involving the other employee had been requested by the Union earlier that week, and Human Resources ("HR") had agreed to respond, but Ms. Argenbright refused to wait. Award at 19; Exhibit G, Tr. 383:11-384:4; 621:17-20.

7

21.    After an investigation, management determined that this incident was serious. A Final Warning was justified in view of the breach of patient security procedures. Award at 3; *see also* Exhibit E. In the Final Warning, Ms. Argenbright was given clear instructions not to enter Surgical Services without permission. Award at 11, 34-35; *see also* Exhibit E; Exhibit G, Tr. 143:4-24. The Employer also revoked Ms. Argenbright's badge access to this area. Award at 11; Exhibit E. Ms. Argenbright's work schedule was changed to Monday through Friday to ensure that her direct supervisor, Monica Leyba, would be available if Ms. Argenbright needed guidance on following policy. Award at 3-4; *see also* Exhibit G, Tr. 143:4-24.

22.    The Employer grew concerned that Ms. Argenbright did not know how to properly exercise her Delegate duties, and informed the District President of the Union, Lorie MacIver, that she should train Ms. Argenbright. Exhibit G, Tr. 385:3-387:3. The Employer set up a meeting with Ms. MacIver for the express reason that it did not want Ms. Argenbright to continue to put herself in situations like the 2015 Surgical Services Incident, which were jeopardizing her job and could lead to termination. *Id.*

23.    The Union did not grieve the Final Warning or file any other claim, even though the event in question related to Ms. Argenbright's Union activity.

### The Evidence Showed, and the Arbitrator Found, that Ms. Argenbright Improperly Accessed Surgical Services in Violation of the Final Warning.

24.    Testimony at the Arbitration hearing established that, after the Final Warning and after the Employer implored the Union to work with Ms. Argenbright to avoid termination form employment, Ms. Argenbright engaged in the exact same misconduct addressed in the Final Warning – namely, conducting Union business in a secure area without authorization (the "2016 Surgical Services Incident"). Award at 10-11, 34; Exhibit F.

25.    On February 2, 2016, Ms. Leyba received a call from Steve Nash, the Executive Director of Surgical Services, informing her that Ms. Argenbright had entered Surgical Services without permission in flagrant violation of her Final Warning. Award at 10; Exhibit G, Tr. 141:8-22. A manager responsible for Surgical Services witnessed Ms. Argenbright talking with another

nurse, Kathleen Cass, in the AM Admissions area of Surgical Services. Award at 10; Exhibit G, Tr. 141:23-24. Ms. Argenbright was assigned to work in the 3200 Med-Surg Unit that day, not Surgical Services, and she had no work-related reason to speak with Ms. Cass. Award at 11; Exhibit G, Tr. 154:1-3.

26.　　Upon investigation, it came to light that Ms. Argenbright was disrupting Ms. Cass during Ms. Cass's work time to perform Union duties. Award at 10-11, 18, 20, 34.

27.　　At hearing, Ms. Argenbright acknowledged that she was texting Ms. Cass during working hours in a way that disrupted Cass during her work. Award at 27; Exhibit G, Tr. 163:21-164:1; 372:1-10. Ms. Argenbright also acknowledged that she went to Surgical Services to take a labor contract and a Union card to Ms. Cass – neither of which functions involve hospital work. Award at 27-28; *see also* Exhibit G, Tr. 371:13-25. Ms. Argenbright acknowledged that she did not have permission from a supervisor to enter the area. Award at 27-28; *see also* Exhibit G, Tr. 367:4-16. This violated contract clauses prohibiting solicitation on work time, hospital security procedures, and Ms. Argenbright's very own specific Final Warning about engaging in that activity in that very department. Award at 18; *see generally*, Exhibit B; *see also* Exhibit E.

28.　　The uncontroverted evidence presented at hearing established that Ms. Cass had a labor contract interpretation question for Ms. Argenbright. Award at 10-11, 18, 27*;* Exhibit G, Tr. 626:2-9; *see also* <u>Exhibit H</u>, a copy of the text messages from Ms. Argenbright to Ms. Cass. Earlier in the day, Ms. Argenbright had texted Ms. Cass during Ms. Cass's work time to arrange lunch in Surgical Services to discuss that issue. Award at 27; *see also* Exhibit G, Tr. 149:1-8; 149:15-23, 370:14-25; Exhibit H. Text messages and Ms. Argenbright's own admissions demonstrated that Ms. Argenbright sought to discuss the contract question and to deliver a copy of the CBA. Award at 27; *see also* Exhibit G, Tr. 624:15-24; Exhibit H. She also asked Ms. Cass whether "Dorothy" was there. Exhibit H. Ms. Argenbright admitted that she wanted to enter Surgical Services to provide "Dorothy," another nurse who was not a Union member, an authorization card to sign up as a Union member. Award at 27; Exhibit G, Tr. 626:10-627:5.

Both goals – Union representation for contract interpretation and signing union authorization cards – are not patient care and are not work-related.[2] This was never contested by the Union or Ms. Argenbright at hearing.

29.     After the morning texts, Ms. Argenbright arrived at Surgical Services unannounced for lunch. Ms. Argenbright went on her lunch break at 12:06 p.m., and texted Ms. Cass at 12:15 p.m. to ask, "May I eat my lunch in your break room? I have your contract." Award at 27; *see also* Exhibit G, Tr. 149:1-8, 162:6-12; 163:21-164:1; 372:1-10; Exhibit H. Ms. Cass did not respond. Award at 27; Exhibit H. Ms. Cass testified that she does not usually text while at work, because she does not have time. Exhibit G, Tr. 439:10-16.

30.     Ms. Argenbright then went to the Surgical Services break room, and texted Ms. Cass again, stating "I am in your break room." Award at 27; Exhibit G, Tr. 150:16-5; *see also* Exhibit H. Ms. Cass responded, "I'm in a meeting," showing that she was at work, not on break. Award at 27; Exhibit G, Tr. 628:12-20; *see also* Exhibit H. Ms. Argenbright wanted to leave a copy of the contract. Award at 27-28; Exhibit G, Tr. 629:3-24. Rather than simply wait until a time when Ms. Cass was off work, Ms. Argenbright texted Ms. Cass, during Ms. Cass's meeting, "I do not see a mailbox with your name on it, may I leave it in Jean Steiger's?" *Id.* She then added, "With another card for Dorothy because the last one got lost? If you can get her to sign it let me know and I'll come pick it up." *Id.*; Exhibit G, Tr. 371:13-25; 631:6-15; *see also* Exhibit H. Like the morning text, these were all sent while Cass was working.

31.     The two did not see each other during Ms. Argenbright's visit. Exhibit G, Tr. 444:7-14; 631:16-18. Ms. Argenbright manually clocked back in at her own unit at 12:36 p.m. Exhibit G, Tr. 162:6-12. The record shows that, about an hour later, at 1:35 p.m., Ms. Argenbright again texted Ms. Cass at work, asking: "Did you find the contract?" Award at 28;

---

[2] The CBA prohibits organizing activities while on the job.  Exhibit B, Section 6.2.3: "Delegates shall not solicit on behalf☐of the Union during working time or in work areas."

10

Exhibit G, Tr. 634:3-17; *see also* Exhibit H. Ms. Cass again did not respond, because she was working. Exhibit G, Tr. 443:8-10; *see also* Exhibit H.

32.     The record shows that about two hours later, at 3:17 p.m., Ms. Argenbright went back to Surgical Services for the second time that day. Award at 28; *see also* Exhibit G, Tr. 162:20-22; 154:4-17, 367:7-16. Like the first time, Ms. Argenbright needed authorization to go into the Surgical Services area, but did not obtain such authorization. Award at 28; *see also* Exhibit G, Tr. 158:8-14; 228:6-18; 640:13-25. She attempted to use her badge to gain access, but it was rejected. Award at 11, 28; *see also* Exhibit G, Tr. 153:4-153:22. Ms. Argenbright then attempted to reach Laurie Parker, another nurse, to gain access, but was unable to do so. Award at 28; Exhibit G, Tr. 156:15-157:1, 231:3-6.  Someone else let her in. *Id.*

33.     Ms. Argenbright disingenuously testified that she went back to Surgical Services to obtain a lost report sheet. Award at 28. Yet, the record shows that her conduct was inconsistent with this action: At 3:17 p.m., Ms. Argenbright again tried to reach Ms. Cass, texting her "Are you still here?" Award at 11; Exhibit H. Ms. Argenbright went there to find Ms. Cass to speak with her and confirm her Union business. There would be no reason to communicate with Ms. Cass if the sole reason for returning was the report sheet. In fact, Ms. Argenbright could have gone to look for her report sheet without going into the patient care area at all. There is a corridor that leads to the break room that does not require entering the patient care area. Instead, Ms. Argenbright accessed the patient care area in Surgical Services when entering and exiting. Award at 28; *see also* Exhibit G, Tr. 156:2-11, 157:9-19.

34.     Ms. Argenbright found Ms. Cass at patient care Bay 3, and had a discussion with her. Award at 30; *see also* Exhibit G, Tr. 149:24-150:7; 643:18-644:1; 706:2-707:10. Ms. Weidner overheard Ms. Argenbright asking Ms. Cass about someone whose name started with a "D." Award at 30; *see also* Exhibit G, Tr. 149:24-150:7; 643:18-644:1; 706:2-707:10; 708:23-709:2.  This was the "Dorothy," to whom Ms. Argenbright wanted to provide an authorization card. When Ms. Argenbright spotted Ms. Weidner walking towards her, she swiftly exited the

area and sped away quickly enough to avoid the supervisor. Award at 30; *see also* Exhibit G, Tr. 709:3-19.

35.     During the hearing, the Grievant *admitted* virtually all of these facts and *admitted* the purpose for her actions that day.

36.     The labor contract and hospital policy are designed to avoid disruption of patient care with these kinds of communications. Award at 2, 18; *see also* Exhibit G, Tr. 484:17-485:2, 486:13-22. Surgical Services involves a sensitive time in patient care where people are prepping for surgery or coming out of surgery. Exhibit G, Tr. 692:19-693:15. Unmanaged Union organizing and grievance advice are not appropriate in that setting. There is an approved way to perform these activities without violating the labor contract or hospital policy.  Just as with her grievance investigation in 2015, Ms. Argenbright decided to skirt these methods. Award at 2, 18. Although Ms. Argenbright's access to Surgical Services had been revoked, she could have asked Surgical Services management for permission to go into the area, but she did not. Award at 29-30; Exhibit G, Tr. 151:10-13. *Id.* The consequence is that Ms. Cass and patients were disrupted.

37.     After investigating, the Employer determined that the 2016 Surgical Services Incident was another iteration of the 2015 Surgical Services Incident which had resulted in a Final Warning, and that it was grounds for termination. Award at 11; *see also* Exhibit F.

38.     In line with the established facts, the Arbitrator's decision acknowledged that during the 2016 Surgical Services Incident, Ms. Argenbright had, in fact, violated the terms of her Final Warning: "[t]he evidence is clear and convincing that [Ms. Argenbright] attempted to enter the area by using her badge which did not permit her to enter." Award at 34.  He found "[w]hen that failed, she entered the area either by being let in a locked door by someone or following someone…." *Id.* He also found that "[s]he went back a second time, again without the permission of a supervisor…." *Id.* He held: "The Grievant had previously been instructed in 2015 not to enter the Surgical Services area unless she was assigned duties in that area or she had permission of a supervisor to be in that area. The prior instructions were part of a Corrective

Action which included a suspension and a Final Warning." *Id.* Oddly, the Arbitrator then created a step not provided in the CBA to ignore termination after a Final Warning: he inserted the notion of a second Final Warning for the same infraction. Award at 34-35. This is a rewrite of the CBA by implying a step into the progressive discipline provisions that does not exist. Exhibit B, CBA § 12.10.

### The Arbitrator Agreed That There Was "Reason for Suspicion" That Ms. Argenbright Had Removed Protected Health Information From Hospital Premises.

39.     On February 3, 2016, the parties held an investigatory meeting to discuss an unrelated patient care incident that had involved Ms. Argenbright several weeks before. Award at 11; *see also* Exhibit G, Tr. 166:8-21. During this meeting, Ms. Leyba witnessed Ms. Argenbright carefully reading protected patient information from a document she had brought with her to the meeting (the "HIPAA Incident"). Award at 11, 21; *see also* Exhibit G, Tr. 170:4-7; 350:17-24. Ms. Leyba noticed that the document Ms. Argenbright was holding and reading from appeared to be a hospital report sheet. *Id.*; *see also* Exhibit G, Tr. 167:5-25.

40.     Ms. Leyba asked Ms. Argenbright if she was reviewing a hospital report sheet. Award at 13-14, 17; Exhibit G, Tr. 167:5-25. Ms. Argenbright denied it. *Id.* Ms. Leyba then asked Ms. Argenbright to show her the document, and Ms. Argenbright refused to do so. Award at 11; *see also* Exhibit G, Tr. 167:5-25.

41.     The parties caucused, at the Union's request, for the Union to discuss the matter with Ms. Argenbright. When the Union returned, the Union refused to show Ms. Leyba the document. *Id.*; *see also,* Exhibit G, Tr. 171:21-172:16. Ms. Argenbright put the document in her bag. *Id.*; Exhibit G, Tr. 172:17-18. The Union representatives present had the opportunity to review the document. The Union representatives could have told the Employer that there was no need for concern. But the Union did not deny that the document was a hospital report sheet or that it contained HIPAA-protected patient information. *Id.*; Exhibit G, Tr. 349:20-350:16. At hearing, the Union representatives again failed to support their own grievant on this key point. The Union representatives remained unable to specify the identification or contents of the

document. Exhibit G, Tr. 504:20-506:7; 529:1-6.

42.    The evidence establishes that *Ms. Argenbright read patient protected information from the document*, including *room numbers and diagnoses of patients,* and in doing so, had either taken a formal hospital report sheet from the department or had copied protected patient information into her own personal notes. Award at 21. Either way, the uncontroverted evidence shows that she accessed, collected, or copied information in violation of the Employer's Policy 104 regarding Failure to Comply with HIPAA Standards, and CBA Section 12.5. Award at 2, 18, 21, 34; *see also* Exhibit B, Section 12.5, and Exhibits C and D. This was grounds for immediate termination under hospital policy.  Exhibit C.

43.    The Arbitrator's decision found that during the HIPAA Incident involving Ms. Argenbright's misuse of protected patient information, "testimony indicated reason for suspicion that Ms. Argenbright might have hospital documents in her possession." Award at 34.  Again, the Arbitrator implied policies into the CBA and Employer's policies under HIPAA by refusing to allow discipline for this incident, including Argenbright's refusal to cooperate in an investigation of a HIPAA breach. *Id.*

### The Arbitrator's Award Disregarded the Parties' CBA Provisions and Rewrote the CBA and Employer Policy.

44.    Despite the findings set forth in the Arbitrator's decision, the Arbitrator issued the Award, ordering the Employer to reinstate Ms. Argenbright to her former position at the hospital and to pay her back pay. *Id.* at 35. The Arbitrator premised the Award on findings that are contrary to the express language of CBA and public policy. The Award must be vacated.

## VI.    LEGAL ARGUMENT

### A.  The Arbitrator's Award Does Not "Draw Its Essence" From the CBA.

An arbitrator's award must have a possibility of being derived from an interpretation and application of the clauses of the agreement. *LB & B Assocs.*, 461 F.3d at 1199. The arbitrator cannot ignore the plain language of the contract and impose his own notions of industrial justice. *Conoco, Inc. v. Oil, Chem. & Atomic Workers Int'l Union (AFL-CIO)*, No. 86-1639, 1988 WL

163062, at *2 (10th Cir. Sept. 12, 1988) (vacated because Arbitrator "based his decision on a principle not found anywhere in the agreement or the industrial common law"). An award does not draw its essence from the collective bargaining agreement if:

> it is contrary to the express language of the contract or is so unfounded in reason and fact, so unconnected with the working and purpose of the agreement as to manifest an infidelity to the obligation of the arbitrator or if viewed in the light of its language, its context, and any other indicia of the parties' intention, it is without factual support.

*LB & B Assocs.,* 461 F.3d at 1197-98 (internal quotation marks omitted); *see also United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987); *Sterling Colorado Beef Co. v. United Food & Commercial Workers, Local Union No. 7,* 767 F.2d 718, 720 (10th Cir.1985).

An arbitrator acts beyond his jurisdiction by fashioning an alternate remedy once he has concluded—implicitly or otherwise—that an employee's conduct constitutes "just cause" for dismissal. When an arbitrator finds that an employee has violated an employer's rule that could lead to termination, and the employer has retained management rights regarding discipline, the arbitrator does not have the authority to circumscribe the employer's rights by fashioning a lesser remedy.  *See e.g.*, *N. States Power Co., Minn. v. Int'l Bhd. of Elec. Workers, Local 160*, 711 F.3d 900, 902-03 (8th Cir. 2013) ("*Northern States*" or "*N. States*"); *Horton Automatics v. Industr. Div. of Comm. Workers of Am.*, 506 F. App'x 253, 256-57 (5th Cir. 2013) ("*Horton*"); *187 Concourse Assoc. v. Fishman*, 339 F.3d 524, 526-27 (2nd Cir. 2005) ("*Fishman*").   An arbitrator has the power to determine a proper remedy only if the Employer lacked just cause.  *Id.*

In *Horton*, the employer sought to vacate an arbitrator's award on the grounds that the collective bargaining agreement provided, *inter alia*, that "the Arbitrator shall be limited to deciding whether a published rule or regulation which formed the basis for discipline was in fact reasonable and violated by the employee." *Horton*, 506 F. App'x at 254. The collective bargaining agreement granted the employer the "exclusive right to 'discharge employees for just cause, subject to contractual provisions.'" *Id.*  The employer set certain safety rules with respect

to equipment used by the employee. *Id.* at 255. The employee admitted that he violated those rules. *See id.* The arbitrator found that the employee violated a safety rule, but nevertheless "was 'not totally convinced' that [the employer] should treat [safety] violations more seriously than other violations" and "found that [the employer] did not have just cause to terminate [the employee], whom he reinstated." *Id.* Upon review, the district "court vacated 'any affirmative relief awarded' to [the employee] in the arbitration award." *Id.* The Fifth Circuit affirmed the district court's order and noted that "the arbitrator exceeded his authority under the [collective bargaining agreement]." *Id.* at 256. The Fifth Circuit explained that the arbitrator found that the employer's rule was reasonable and that the grievant actually violated the rule; thus, the arbitrator implicitly, found that the employer had just cause. Because the arbitrator had the power to determine a proper remedy *only* if the Employer *lacked just cause*—the arbitrator had nothing more to do. The Fifth Circuit declined to remand the case to the arbitrator for further proceedings.

In *Northern States*, an employer brought an action to vacate an arbitration award, arguing that the arbitrator exceeded his authority under a collective bargaining agreement. *N. States*, 711 F.3d 900, 900-01. The arbitrator decided that the employee "was convicted of a serious crime that raises some very legitimate concerns on the part of the Management going forward, they have demonstrated justification for their decision. At the same time however, the Union has presented convincing evidence which sets forth a number of factors that existed which ultimately favor the imposition of a penalty less than the [employee]'s dismissal." *Id.* The arbitrator then ordered that the employer return the employee to work without back pay. *Id.* Upon review, the district court vacated the award of reinstatement, and the Eighth Circuit affirmed the district court's order. *Id.* at 901-02. The Eighth Circuit followed the Second and Fifth Circuits, reasoning that the language of the arbitrator's decision was sufficient to show that the arbitrator found the termination was supported by "just cause," and having answered that question in the affirmative, the arbitrator had no authority to fashion a remedy different than the termination. *Id*.

16

at 902. An arbitrator acts beyond his jurisdiction by fashioning an alternate remedy once he has concluded—implicitly or otherwise—that an employee's conduct constitutes just cause for dismissal. *Id.*

The Arbitrator here ignored the 2015 Final Warning, and wrote into Section 12.10 of the CBA an additional step for a second Final Warning on the same infraction prior to termination. Exhibit B, CBA Article 12, Associate Discipline. The CBA is clear that "in no case shall the Arbitrator have the power to add to, nor subtract from, or modify this Agreement…" Exhibit B, CBA, Article 30 Grievance and Arbitration Procedure, Section 30.19.5. He also substituted his discretion for the Employer's by rewriting the procedure and by allowing a violation of the CBA's HIPAA-related policies with a refusal to cooperate in the investigation of same. That is likewise prohibited by the CBA in Article 12. Like the arbitrators in *Horton* and *Northern States,* this Arbitrator ignored the management rights language of the CBA at issue, and substituted his own notions of industrial justice for management's discretion. In such a situation, the Court should vacate the Arbitrator's Award.

**B.  The Arbitrator's Award Was Ultra Vires in Light of His Findings Regarding the 2016 Surgical Services Incident.**

The Arbitrator ignored the plain language of the CBA when he reduced the Termination to a Final Warning – rendering a record of two final warnings in a row. The Arbitrator exceeded his authority by finding that Ms. Argenbright violated the Employer's rules and the proscriptions of a Final Warning, but should not be subject to Termination after already receiving a legitimate and unchallenged Final Warning.

The Employer has the management right to "exercise functions traditionally performed by management," including "[d]ecisions concerning the counseling, reprimanding, discipline and discharge of associates for just cause with the specific understanding that any discipline must be for just cause and that the Union may grieve and arbitrate any such decisions under this Agreement." Award at 2; *see also* Exhibit B, § 7.1, § 7.1.16. The CBA further provides:

> The Arbitrator shall have the authority to determine if there was just cause for any disciplinary action. However, in no case shall the Arbitrator have the power to add to, nor subtract from, or modify this Agreement, nor shall the Arbitrator substitute their discretion for that of the employer where such discretion has been retained by the employer, nor shall the Arbitrator exercise any responsibility or function of the employer, including but not limited to, the ability to set standards of patient care.

Exhibit B, § 30.19.5.

The CBA provides a specific progressive discipline policy for violations of CBA rules and hospital policies: "The four (4) basic steps listed below will be followed for disciplinary action. These steps will generally be taken in the order listed, although some steps may be omitted when serious offences have been committed." *See* Award at 2 (referencing the parties' CBA); *see also* Exhibit B, §12.10. The four basic steps include: (1) Documented Verbal Counseling, (2) Written Warning (3) Final Warning or Suspension, and (4) Termination. *Id.* Ms. Argenbright had already received a Final Warning for the 2015 Surgical Services Incident, and thus, termination was the next step in the parties' agreed-upon progressive discipline procedure. Nothing in the procedure provides for a second final warning or reducing a final warning that has not been contested.

The Arbitrator found that, after receiving her Final Warning, Ms. Argenbright again accessed Surgical Services without authorization. *See* Award at 34. The Award acknowledges, as it must, that the Employer presented clear and convincing evidence that Ms. Argenbright in fact entered the Surgical Services area twice without authorization during the 2016 Surgical Services Incident:

> [A] reason cited for the discharge of Ms. Argenbright was her unauthorized entry into the Surgical Services department. The evidence is clear and convincing that she attempted to enter the area by using her badge which did not permit her to enter…. The Grievant had previously been instructed in 2015 not to enter the Surgical Services area unless she was assigned duties in that area or she had permission of a supervisor to be in the area. The prior instructions were part of a Corrective Action which included a suspension and a final warning.

Award at 34-35.

The seriousness of the 2016 Surgical Services Incident is alarming, given Ms. Argenbright's years of experience, the Final Warning less than a year earlier, and the Employer's entreaty to the Union to train Ms. Argenbright in her Union duties. Even after Ms. Argenbright was made explicitly aware that she was not to enter Surgical Services without authorization, and given an opportunity to change her behavior, she continued to violate the hospital's express policies and procedures. Exhibits E and F. Despite Ms. Argenbright's experience, knowledge and training relating to the CBA, the hospital's policies, HIPAA requirements, and patient care, Ms. Argenbright repeatedly failed to follow clear protocols. *Id.*

The Arbitrator specifically acknowledged that Ms. Argenbright entered Surgical Services in violation of her previous instructions. Award at 34-35. She was only permitted to enter Surgical Services if she was assigned duties in that area or she had permission of a supervisor to be in the area. *Id.*  Her actions violated the CBA, hospital policy, and the Final Warning, which stated: "Failure to adhere to the corrective measure described… may result in … termination for similar or any other hospital policy violation." Exhibit F. [3]

It was error for the Arbitrator to conclude that "the discharge is reduced to a suspension of 6 months," and "[t]his is considered equitable and commensurate with the evidence." Award at 35. If an arbitrator can "reduce…commensurate with the evidence" something that is a contract right, like a step of the parties' contractual discipline procedure or a management right, and eliminate the import of an unchallenged Final Warning for conduct repeated a second time,

---

[3] The parties agreed upon and established a rule that: "Delegates shall not solicit on behalf☒of the Union during working time or in work areas. This includes working time of the associate conducting the solicitation as well as the associate to whom such activity is directed." Exhibit B, CBA § 6.2.3. The parties further agreed-upon and established a rule that: "associates on☒break should not go into other work areas for non-business purposes and interfere with or distract other associates who are working at the time." *Id.*, CBA § 9.3. In addition, the parties agreed that, "The failure of an associate to observe CSVRMC's safety rules … may subject the associate to disciplinary action." Exhibit B, CBA §34.2.☒

then the arbitrator is exercising unfettered power to alter the parties' intent in the contract. Modifying the contract is not justified by what the Arbitrator thinks is "equitable." That is exercise of power far beyond what an arbitrator is granted in these proceedings. This Arbitrator brought his sensibilities outside the parties' course of dealing and substituted it for the parties' contract. Arbitration has no integrity as a process for industrial stability when arbitrators are allowed to do that. The jurisprudence does not allow this kind of arbitral authority or misconduct. Equity is no cover for refusing to enforce a contract right, no matter how uncomfortable an arbitrator may be in doing so. For the reasons set forth above, the Arbitrator's findings exceed the authority granted by the parties and do not draw their essence from the CBA. Thus, the Award must be vacated.

### C. The Arbitrator's Award Was Ultra Vires in Light of His Findings Regarding the HIPAA Incident.

The Arbitrator also exceeded his authority by finding there were no grounds for termination where there was reason for suspicion that Ms. Argenbright violated the Employer's HIPAA-related rules, and allowing the Grievant's own refusal to cooperate in the investigation of her conduct to let her off the hook for the "suspicion." Award at 34. The CBA specifically contains a provision that provides that "associates will not access, collect, copy, misuse, or disclose patient medical charts, potentially identifiable patient medical information, or personnel files." Award at 2 (referencing the parties' CBA); *see also* Exhibit B, § 7.1.16 and § 12.5.

The parties' CBA grants the Employer a management right regarding the "[a]doption and implementation of new policies, work rules, procedures and regulations, as well as the modification or amendment of existing policies, work rules, procedures and regulations." Award at 2 (referencing the parties' CBA); *see also* Exhibit B, § 7.1.11. CSVRMC implemented a policy governing HIPAA, entitled "Sanctions for Failure to Comply with HIPAA Standards," which was in effect at the hospital in 2015 through the present. Award at 2-3; *see also* Exhibit C, a copy of the policy "Sanctions for Failure to Comply with HIPAA Standards." That policy states: "It is the policy of CHRISTUS Health that all workforce members must adhere to policy

20

and procedures designed to prevent or detect unauthorized disclosure of Protected Health Information (PHI.)" *Id*. It requires that "[i]ntentional unauthorized disclosure or access to PHI in verbal, written or electronic means for commercial or personal gain or for curiosity or for malicious harm will result in *immediate termination of employment*." *Id*. (emphasis added).

The Arbitrator's Award held that, during the HIPAA Incident involving Ms. Argenbright's misuse of protected patient information, "testimony indicated reason for suspicion that Ms. Argenbright might have hospital documents in her possession." Award at 34.   The Arbitrator acknowledged that both Ms. Leyba and Ms. Dominguez testified that they witnessed Ms. Argenbright reading protected health information from the document in her possession. The Arbitrator summarized Ms. Leyba's testimony as follows: "Ms. Leyba said that during an investigation meeting on February 4, 2016, she was concerned that Ms. Argenbright had hospital documents in her bag that she brought with her to the meeting."   Award at 11. He stated, "…during the meeting she became concerned that Ms. Argenbright might have documents in her possession that might be a HIPAA violation." Award at 13-14. The Arbitrator summarized Ms. Dominguez's testimony as follows: "Ms. Argenbright said she was reading from her notes which she obtained from a Journal that she kept each day. Ms. Dominguez said that the Grievant did not mention any names, but she did provide *room numbers and diagnoses of patients*." *Id.* at 21.

Clearly, Ms. Argenbright used the protected patient information for her own "personal gain." She used it to defend herself in a disciplinary matter. There is no more personal reason to appropriate what does not belong to a person than to use it to retain one's own employment.

The Arbitrator relied on a flawed understanding of the parties' CBA to reach his conclusion that the Employer did not provide evidence of a "HIPAA violation":

> a collective bargaining agreement provision states that notes are not subject to disclosure.  Therefore, no violation of the collective bargaining agreement was found in the refusal to disclose notes in the possession of Ms. Argenbright. Consequently, no evidence was provided at hearing of a HIPAA violation by Ms. Argenbright.

*Id*. at 34.

As shown at hearing, this is a fundamental and substantial misreading of the Grievance and Arbitration article of the CBA in addressing discovery in arbitration proceedings. First, Section 30.13.1 addresses what "the parties" are required to produce to each other in discovery. Ms. Argenbright is not a "party" to the CBA. She is the grievant. The document she read from, according to her, was her personal notes on patient care, not a Union document prepared for arbitration. Second, Section 30.14.1 is limited to documents "constituting or reflecting its internal deliberative process or decision-making." No one in this case has contended that Argenbright's personal notes were the Union's notes on the Union's internal deliberative process or decision-making. There is no evidence of this and, in fact, the evidence is to the contrary. Nor did the Union representatives make this case at hearing: they were mute on the nature of the documents. Not one Union witness or its legal counsel suggested the notes were the Union's and were related to the Union's deliberations or decision-making on the grievance. There was no objection of this nature. The Arbitrator, in struggling to find a way to justify Ms. Argenbright's refusal to cooperate in a HIPAA investigation, relied upon irrelevant language regulating discovery in arbitration proceedings.

The manner in which the document was used and the information read from it have nothing to do with Union deliberations or decision-making. During the February 3 investigatory meeting, Ms. Argenbright read protected health information from a document in her possession. Award at 11, 17. That made the document and information in it relevant to the Employer's HIPAA policies. The Union cannot now state that the information somehow reflects a deliberative process. The fact that Ms. Argenbright and her Union representatives refused to cooperate with the investigation and turn over the document does not change the fact Ms. Argenbright's very reading of the information to members of management established that she violated both the CBA and hospital policies. That in itself is a violation of the hospital's rules implementing HIPAA protections. Ms. Argenbright own personal notes were created by collecting, copying, and misusing patient medical charts and potentially identifiable medical

information for personal reasons, in violation of the hospital's HIPAA policy and the parties' CBA.

The Arbitrator misconstrued the nature of discipline here by using the wrong legal standard. The Arbitrator found that "no evidence was provided at hearing of a *HIPAA violation* by Ms. Argenbright." Award at 34 (emphasis added). The Arbitrator's holding ignores the standard set by the CBA and the hospital's policies: the Employer was not required to prove that a HIPAA violation had occurred, but rather, was required to prove that *hospital policies relating to HIPAA* had been violated. The Employer need only establish this by a preponderance of the evidence, *e.g.,* that it is more likely than not that Ms. Argenbright violated the hospital's policies. The Employer presented evidence that Argenbright's notes contained patient health information accessed, collected, or copied in violation of Section 12.5 of the CBA. Award at 2 (referencing parties' CBA), 11, and 21. The Arbitrator acknowledged that the evidence presented gave "reason for suspicion." Award at 34. Discipline was clearly warranted under the Employer's Management Rights. The Court should note that the Employer is not asserting that this incident alone warranted termination: in conjunction with violating the terms of her Final Warning, this was a compounding incident that justified termination from employment. This was especially true for a Union Delegate who understood the HIPAA policies and acknowledged that she had received them. For this additional reason, the Court should vacate the Arbitrator's Award.

### D.  The Award Should Be Vacated Because the Arbitrator's Decision Violates Well-Established Public Policy Regarding Patient Protected Health Information.

An award must be vacated if it violates well-established public policy. *W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757 (1983). To set aside an arbitrator's decision for public policy reasons, the public policy must be ascertained "by reference to the laws and legal precedents and not from general considerations of supposed public interests." *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers of Am.*, 461 U.S. 757, 766, (1983).

The protection of patient health information is to be treated seriously. In enacting HIPAA, Congress recognized that the provision of high-quality health care requires the exchange of personal, often-sensitive information between an individual and a skilled practitioner. 45 CFR Part 160; 65 Fed. Reg. 82462, 82463.  Vital to that interaction is the patient's ability to trust that the information shared will be protected and kept confidential. *Id*. In the regulations promulgated pursuant to HIPAA, the U.S. Department of Health and Human Services emphasized the importance of maintaining the privacy of medical information, concluding that "[p]rivacy is a fundamental right" and that "[a] right to privacy in personal information has historically found expression in American law." 45 CFR 160; *see* 65 Fed. Reg. at 82464. The Department of Health and Human Services has explained: "A major goal of the [HIPAA] Privacy Rule is to assure that individuals' health information is properly protected while allowing the flow of health information needed to provide and promote high quality health care and to protect the public's health and well-being. The Rule strikes a balance that permits important uses of information, while protecting the privacy of people who seek care and healing."  U.S. Dept. of Health & Human Services, Office for Civil Rights, "Summary of the HIPAA Privacy Rule," *HIPAA Compliance Assistance* (2003), https://www.hhs.gov/sites/default/files/privacysummary.pdf. HIPAA strikes a balance between permissible and impermissible uses. *Id.*  For these reasons, the Employer, a covered entity, is permitted to use protected health information in the course of its healthcare operations.[4] On the other hand, Ms. Argenbright was not permitted to knowingly use, obtain, or disclose individually identifiable health information.[5]

---

[4] The Employer is not prohibited from obtaining, using or disclosing protected health information ("PHI") in administrative activities associated with its healthcare operations. Healthcare operations include, by way of example: conducting or arranging for legal services, business management and administrative activities. 45 C.F.R. §164.501.

[5] A person violates HIPAA when he or she knowingly uses, obtains, or discloses individually identifiable health information relating to an individual. 42 U.S.C. §1320d-6. A person is considered to have obtained or disclosed individually identifiable information if the information

The Employer treats HIPPA protected information with the seriousness it deserves, particularly because the hospital and its employees can be sanctioned under law for a misuse of protected health information. Exhibit G, Tr. 350:25-351:22. In fact, violation of the Privacy Rule is so serious that it carries criminal penalties. *Id.* The Employer complies with this Rule, in part, by maintaining and enforcing HR Policy 104, Sanctions for Failure to Comply with HIPAA Standards. Award at 2-3; *see also* Exhibit C. Hospital policy provides that intentional misuse of private health information, as described in the policy, is grounds for *immediate termination*. Exhibit C. Employees at CSVRMC are required to acknowledge that they will☐follow federal law regarding protected health information.  Award at 2-3, 5; *see also* Exhibit D.  In this case, Ms. Argenbright agreed not to divulge, copy, or release confidential information for personal benefit. *Id.* Ms. Argenbright certified as follows: "I understand that… Violations of the terms of this Agreement may subject me to legal penalties and/or disciplinary action, up to and including termination of employment, under policies of [CSVRMC] …." *Id.* Also, the parties have agreed to comply with this rule by adopting a provision in their CBA that states:  "The parties agree that associates will not access, collect, copy, misuse, or disclose patient medical charts, potentially identifiable patient medical information, or personnel files." Exhibit B, CBA §12.5.

As discussed above, the Arbitrator relied on a technicality in the CBA to find that "…notes are not subject to disclosure…" and "…no evidence was provided at the hearing of a HIPAA violation by Ms. Argenbright," despite the fact that he acknowledged testimony that Ms. Argenbright read patient information from the document she brought to the meeting for the purpose of her own job security, and not in any way related to providing patient care.  Award at

---

is maintained by a covered entity (such as a health care provider) and the individual obtained or disclosed the information without authorization. *Id*. A patient's authorization is required for uses and disclosures beyond those for treatment, payments, or healthcare operations. 45 C.F.R. §164.508(a). Thus, Ms. Argenbright was not permitted to obtain or use this information.

11, 21, 34. He concluded and agreed that "testimony indicated reason for suspicion that Ms. Argenbright might have hospital documents in her possession." Award at 34. Allowing an employee to collect and misuse patient information, refuse to cooperate in an investigation of the matter, and avoid discipline flies in the face of well-established public policy involving the privacy of protected health information. As a result, the Award should not stand.

## VII.   PRAYER FOR RELIEF

WHEREFORE, CSVRMC respectfully requests that the Court enter an order:

a.   Staying the enforcement of the award until the resolution of this Petition;

b.   Vacating the Arbitration Award; and

c.   Granting such other relief as the Court deems proper.

Dated: April 13, 2017                          Respectfully submitted,

HINKLE SHANOR LLP

/s/ Jaclyn M. McLean
Ellen S. Casey
Jaclyn M. McLean
P.O. Box 2068
Santa Fe, NM 87504-2068
Telephone: 505-982-4554
Facsimile: 505-982-8623
Email: jmclean@hinklelawfirm.com
         ecasey@hinklelawfirm.com
*Attorneys for Defendant CSVRMC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 13th day of April 2017, I caused a true and correct copy of the foregoing **CHRISTUS ST. VINCENT REGIONAL MEDICAL CENTER'S PETITION TO VACATE ARBITRATION AWARD** to be filed electronically through the CM/ECF system. Notice of this filing will be sent to counsel of record for all parties by operation of the Court's Electronic Filing System.

Shane Youtz
Stephen Curtice
James Montalbano
Youtz & Valdez, PC
900 Gold Ave SW
Albuquerque, NM 87102
stephen@youtzvaldez.com
shane@youtzvaldez.com
james@youzvaldez.com

/s/ Jaclyn M. McLean
Jaclyn M. McLean

27